UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALPACINO MCDANIELS,

          Petitioner,

   v.

DANNY SAMUEL, Acting Warden,[1]

          Respondent.

Case No.  19-cv-01408-HSG (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

## I.    INTRODUCTION

Petitioner Alpacino McDaniels, a state prisoner currently incarcerated at the California Men's Colony, brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of a conviction obtained against him in state court.

Respondent has filed an answer to the petition.  Dkt. No. 22.  Even though Petitioner was given the opportunity to do so, he has not filed a traverse, and the time frame for doing so has passed.  For the reasons set forth below, the petition is denied.

## II.    PROCEDURAL HISTORY

Petitioner was charged with murder after 23-year-old Teric Traylor was shot and killed during a street fight in West Oakland.  An Alameda County jury found Petitioner guilty of first-degree murder and possession of a firearm by a felon, and found firearm use enhancements alleged in connection with the murder count to be true.  2 Clerk's Transcript ("CT")[2] 154-156.  In a

---

[1] Danny Samuel, the current acting warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Respondent's exhibits to the Answer are docketed at Dkt. Nos. 22-3 through 22-10.  The CT has been lodged as Exhibits 1A-1B (*see* Dkt. Nos. 22-3 and 22-4), the Augmented CT ("Aug. CT") as Exhibit 2 (*see* Dkt. No. 22-5), and the Reporter's Transcript ("RT") as Exhibits 3A-3D (*see* Dkt. No. 22-6 - 22-9).

bifurcated hearing, the trial court found that Petitioner had served four prior prison terms.  2 CT 162.  The trial court sentenced Petitioner to fifty years to life in state prison.  2 CT 166-169.

Petitioner appealed the conviction, and contended that (1) the trial court erred by denying his request for a pinpoint jury instruction about suggestive identification procedures; (2) the prosecutor committed misconduct by commenting on Petitioner's failure to testify; (3) the trial court should have stayed his sentence for the firearm possession offense; and (4) he is entitled to two additional days of custody credits and the abstract of judgment inaccurately reflects the sentence imposed for the murder count.  Dkt. No. 22-11 at 5-7; Resp't Ex. 5.  On April 17, 2018, the California Court of Appeal remanded the case to consider whether to strike the firearm enhancements and to correct errors in the calculation of custody credits and the abstract of judgment, but otherwise affirmed the judgment.  Dkt. No. 22-11; Resp't Ex. 8.  On May 17, 2018, Petitioner filed a petition for review in the California Supreme Court, which was denied on June 20, 2018.  Dkt. No. 22-11; Resp't Exs. 9, 10.

On September 25, 2018, Petitioner filed a petition for a writ of habeas corpus in the Alameda County Superior Court, which was denied on October 29, 2018.  Dkt. No. 22-12; Resp't Exs. 11, 12.

On March 4, 2019, Petitioner filed a petition for a writ of habeas corpus in the California Court of Appeal.  Dkt. No. 22-12; Resp't Ex. 13.

On March 18, 2019, Petitioner filed a petition for a writ of habeas corpus in this Court, which commenced this case.  Dkt. No. 1.  In his petition, Petitioner acknowledged that not all his claims were exhausted and stated his intention to file a motion for a stay and abeyance.  *Id.* at 12.[3]

On April 18, 2019, the Court found that the petition stated the following cognizable claims for federal habeas relief: (1) ineffective assistance of appellate counsel; (2) the trial court erred by admitting tainted evidence; (3) the prosecution failed to preserve or turn over exculpatory evidence; (4) the trial court erred in allowing the video reenactment; (5) the prosecutor committed misconduct by allowing false testimony at trial; (6) the trial court erred by denying Petitioner's

---

[3] Page number citations for the parties' filings refer to those assigned by the Court's electronic filing system and are located at the top right-hand corner of each page.

United States District Court
Northern District of California

1  request for a pinpoint jury instruction about suggestive identification procedures; (7) the

2  prosecutor committed *Griffin*[4] error by relying on Petitioner's jail conversations with his mother

3  and girlfriend as evidence of his consciousness of guilt; and (8) the prosecutor committed *Griffin*

4  error by making reference to the lack of alibi evidence as an indirect comment on Petitioner's

5  failure to testify.  Dkt. No. 11 at 2.  The Court ordered Respondent to show cause why the petition

6  should not be granted.  *Id.*  The Court noted that Petitioner had acknowledged that he had not

7  exhausted all claims, but declined to *sua sponte* address the issue of exhaustion of state remedies

8  because the Court could not determine from the record which claims had been exhausted.  *Id.*

9  On May 9, 2019, the California Court of Appeal denied the petition for a writ of habeas

10  corpus.  Dkt. No. 22-12; Resp't Ex. 14.

11  On June 10, 2019, Petitioner filed a petition for writ of habeas corpus in the California

12  Supreme Court raising the same claims as his federal petition, except he did not include claim 3

13  (the prosecution failed to preserve or turn over exculpatory evidence).[5]  Dkt. No. 22-12; Resp't

14  Ex. 15.  On September 11, 2019, the state supreme court denied the petition.  Dkt. No. 22-12;

15  Resp't Ex. 16.

16  On July 17, 2019, Respondent filed a motion to dismiss claims 1-5 and 7[6] of the federal

17  habeas petition for failure to exhaust state court remedies.  Dkt. No. 13.

18  Petitioner did not file an opposition to Respondent's motion.  Nor did Petitioner file a

19  motion to stay and abey this action.  Instead, on September 29, 2019, Petitioner filed with the

20  Court the California Supreme Court's September 11, 2019 summary denial of his state habeas

21

22  [4] *Griffin v. California*, 380 U.S. 609, 615 (1965) (The self-incrimination clause of the Fifth
23  Amendment "forbids either comment by the prosecution on the accused's silence or instructions
    by the court that such silence is evidence of guilt.").

24  [5] The record shows that when Petitioner filed his habeas petition with the California Supreme
25  Court, he omitted the first page of claim 3 and only filed the second page.  Dkt. No. 22-12 at 842-
    843; Resp't Ex. 15 (habeas petition filed with the California Supreme Court).  The California
26  Court of Appeal noted that claim 3 had been omitted from the state appellate court petition as well
    (in the same manner).  *See* Dkt. No. 22-12 at 802; Resp't Ex. 14; *see also* Dkt. No. 22-12 at 456-
27  57; Resp't Ex. 13 (habeas petition filed with the California Court of Appeal).

28  [6] Respondent conceded that claim 6 (rejection of pinpoint instruction) and claim 8 (*Griffin* error
    relating to prosecutor's reference to lack of alibi evidence) are exhausted.  Dkt. No. 13 at 3.

petition.  Dkt. No. 16.

On January 15, 2020, this Court granted the motion to dismiss as to claim 3, denied it as to claims 1, 2, 4, 5 and 7, and ordered Petitioner to make an election as to how he wished to proceed. Dkt. No. 18 at 10-11.

On June 9, 2020, the Court noted that Petitioner never informed the Court how he wished to proceed, and accordingly set a briefing schedule for an answer and traverse addressing claims 1-2 and 4-8.  Dkt. No. 21.  An answer was filed on August 10, 2020.  Dkt. No. 22.  Petitioner has not filed a traverse, and the time to do so has passed.

## III.    STATEMENT OF FACTS

The state appellate court handled the direct appeal filed by Petitioner in an unpublished opinion and described the relevant facts as follows:[7]

### A.  829 Mead Avenue.

The murder occurred around 7:30 a.m. on July 6, 2013, on Mead Avenue, a one-block street that runs between San Pablo Avenue and Market Street in West Oakland.  An Oakland police sergeant testified that the block, which is commonly referred to as "Mead Street," was "basically a 24-hour open air drug market" and had been the site of "numerous shootings" and other "violent activity."  The primary site of drug sales was a liquor store at the corner of Mead and Market, but drug dealers would also station themselves elsewhere on Mead.  The sergeant knew McDaniels, whose "street alias [was] Capone," and had seen him on Mead.  McDaniels's "name would come up in some . . . narcotics investigations out there as one of the main . . . dealers from the block."

Charles F., who testified under a grant of immunity, lived at his stepmother's house at 829 Mead with several others.  His father, Jeffrey F., lived in San Francisco but would visit the house on weekends.  The night before the murder, Charles F. and Jeffrey F. were "up all night partying, drinking, smoking weed and just chillin'" at the house.  Also present were Charles F.'s sister, L.F., and L.F.'s boyfriend, W.L., both of whom also lived at 829 Mead and had recently begun dating.  Charles F. denied that drug sales or any other "illegal activities" occurred at the house.  He admitted, however, that the month after the murder he was arrested in front of the home with "[f]ive rocks" in his pocket.

W.L. had moved into 829 Mead the previous winter after meeting one of Charles F.'s

---

[7] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

brothers in jail.  W.L. testified that 829 Mead was a "trap house" where crack cocaine was used and sold.  He knew McDaniels, who went by "Capone," because McDaniels was "a really good friend" of Charles F.'s and "would come over to 829 Mead" several times a week.  W.L. had also seen McDaniels hanging out at the liquor store at Market and Mead, which he knew as a site of drug activity.  W.L. testified that he never had any problems with McDaniels, though he did not consider him a friend.

According to W.L., the night before the murder McDaniels was outside on the porch of 829 Mead while everyone else was drinking and smoking.  Charles F., on the other hand, claimed that McDaniels was not present.  Indeed, he denied personally knowing McDaniels, although he was aware that McDaniels used to hang out on Mead.  Charles F. claimed that he would greet McDaniels if he saw him on the street, but that McDaniels had never been to his house.  Jeffrey F. acknowledged knowing McDaniels as "Capone" and similarly claimed to have seen him in the neighborhood but never at 829 Mead.

**B.   The Fight on Isabella Street.**

The morning of the murder, Charles F. and Jeffrey F. went to a convenience market to buy food.  Charles F. was wearing a tank top, and his father was wearing a brown sweatshirt.  Although the market was on Isabella Street, only a few blocks away, Charles F. drove them there in his green Cutlass.  The two men were still intoxicated, and after Charles F. got out of the car Jeffrey F. drove it away as a joke.

Left standing in the market's parking lot, Charles F. began yelling at his father.  Traylor, whom neither Charles F. nor Jeffrey F. had seen before, became upset by the yelling and told Charles F. something to the effect of "shut the fuck up."  After Jeffrey F. came back, Charles F. and Traylor continued to argue as all three men walked into the middle of Isabella.  Charles F. and Traylor "did a lot of circling" as if they were going to fight but did not throw any punches.

A man who lived in a nearby condominium testified that at about 7:15 that morning, he and his wife "heard a disturbance" outside their window, which faced onto Isabella.  They observed a small group of people, two of whom were "squaring off" and seemed ready to fight.  Both were African-American men and appeared to be in their twenties.  One of the men "was shorter and more squat," had dreadlocks, and was wearing a white tank top, a description matching Charles F.  The other man "was taller and . . . more lean" and had "very short hair," a description matching Traylor.

The wife also described two other African-American men present who were "encouraging the fight."  One was an "older gentleman" with "some salt and pepper hair" who was "wearing a brown sweatsuit outfit," a description matching Jeffrey F.  The other was "around 30, larger, about 6 foot, . . . [and] probably about 200 pounds, wearing a black hooded sweatshirt and black sweat pants."

The husband left to go out, and he drove his car from the building's garage onto Isabella.  He headed down the street toward the group of men, who were blocking his way.  He asked them to move, and he then heard "a big thud" from the back of his car.  He believed one of the bystanders had kicked or punched his car, and he described that man as "closer in composition to the leaner guy that was squaring off in the fight" and "maybe 5'10", 5'11"."  The bystander had "close cropped" hair that "wasn't dreadlocks" and "may have

[had] some facial hair," and he was wearing "dark clothing" and smoking a cigarette. At trial, the husband was unable to identify the bystander as McDaniels. Charles F. testified that he could not recall anyone present on Isabella kicking or punching a car.

Meanwhile, the wife called the police to report the fight. She watched her husband exit the garage and saw the bystander wearing "the black sweat outfit" yell something and kick the car. Her husband drove away, and she hung up after being told police units had been dispatched. She eventually saw the man whose description matched Jeffrey F. walk up Isabella while the man whose description matched Charles F. got into the driver's seat of a parked green sedan. The man wearing the black sweatsuit got into the passenger's seat of the green sedan, and the car headed up Isabella. Finally, the man whose description matched Traylor began walking up Isabella in the same direction as the other men had gone.

Consistent with the wife's testimony, Charles F. said he drove back to Mead, leaving his father and Traylor on Isabella. Jeffrey F. also confirmed that he walked down Isabella toward Mead and Traylor followed him. When Charles F. got back, he parked and went inside 829 Mead, where he saw L.F. and W.L. Charles F. went back outside to check on his father, and L.F. and W.L. eventually came outside as well. Charles F. heard his father and Traylor yelling as they approached. Jeffrey F. and Traylor then turned onto Mead, and Charles F. and Traylor started physically fighting.

## C. The Murder.

### 1. *W.L.'s testimony about the murder.*

W.L. testified that he was standing on 829 Mead's porch and saw Charles F. and Traylor in the middle of the street fighting with each other. W.L. described Traylor as a "young boy" whom he had not seen in the neighborhood before. "[A] fairly large crowd" was present, and W.L. could hear people saying, "'Whoop his ass. Get him. Beat his ass. He's a bitch. You're a bitch. Whoop his ass. I'm going to fuck you up, motherfucker,' that terminology." It appeared to W.L. that Traylor was winning the fight.

W.L. then observed a man he had never seen before hand a semiautomatic chrome gun to McDaniels, who was wearing a black hooded sweatshirt and had been holding a beer and smoking a cigarette. Still holding the beer, McDaniels "opened fire" on Traylor, hitting him. W.L. heard about six "sporadic[]" shots before McDaniels handed the gun back to the same man. Traylor tried to run away, and many of the spectators, including McDaniels, ran into 829 Mead. W.L. saw a woman, whom he knew as "a local crackhead," picking up shell casings from the street.

W.L. testified that he did not speak to the police on the day of the murder because he had an outstanding warrant. Three days later, he was arrested at 829 Mead for domestic violence against L.F. On the way to jail, he reported the murder to a police officer and was taken to be interviewed by detectives. During the interview, he identified McDaniels as the shooter from a photographic lineup. W.L. also told the detectives, contradicting his testimony at trial, that when the shooting began McDaniels "already had the gun on him."

At trial, W.L. admitted he reported the murder to the police because he wanted to avoid

being sent to jail.  He also admitted he lied by telling the police he was "[r]ight in the middle of" the fight, not on the porch, when the shooting occurred, and he explained that he did so because he thought the police would then be more inclined to believe him.  W.L. stated that he was nervous about testifying but felt it was "the right thing to do."

### 2.  *M.G.'s testimony about the murder.*

At the time of the murder, M.G. was a resident of a treatment program to address her addiction to heroin.  The recovery center was located on Mead, and her apartment had a view of that street.  Around 7:30 a.m., M.G. was awakened by the sound of arguing.  She went to the window to see what was happening, and she saw two men fighting while several other people watched and "egged [them] on."

One of the fighters, whose description matched Charles F., was a "black man with dreads" who was "heavyset" or "fat" and looked to be in his thirties.  He was wearing a white tank top and blue jeans.  She did not know his real name, but she had seen him on Mead before and thought he went by "Chunky."[FN 5]  The other was Traylor, whom she did not know and whom she described as in his late teens or early twenties and "small."  She did not see a weapon in either man's hands.

[FN 5:] Charles F.'s actual nickname was "Cheese."  He denied that anyone had ever called him "Chunky," although he also testified that the nickname "Cheese" came from "Chucky Cheese."

The men eventually stopped physically fighting, but they were still arguing in the middle of the street.  According to M.G., Traylor "kept calling dude with the dreads a bitch, and dude with the dreads kept saying, 'Oh, I'm a bitch?  Oh, I'm a bitch?'"  M.G. then saw McDaniels turn the corner from San Pablo onto Mead.  She did not know his real name, but she had known him "by face" for about four years.  He was a drug dealer, and she had bought marijuana from him once or twice.  At some point before the murder, he had also hit on her.

M.G. testified that as McDaniels turned onto Mead, he walked into the street.  He was wearing a black hooded sweatshirt and blue jeans.  She did not see McDaniels holding either beer or cigarettes, in contrast to what W.L. had claimed to see.  M.G. heard Charles F. say "'[g]ood night'" to Traylor.  McDaniels then asked Traylor, "[O]h, he a bitch?," and "pulled . . . out" a "silver automatic" gun.  M.G. saw Traylor start walking away, and McDaniels fired seven or eight shots, hitting Traylor in the back.  Traylor collapsed, and McDaniels handed the gun to another person and ran up the street.  M.G. then saw a woman picking up shell casings.

Shortly after the shooting, M.G. told a friend she had just witnessed a murder and knew the person who had done it.  The recovery center's property manager overheard M.G. and "made [her] talk to the police."  M.G. was reluctant to talk to the police, because she did not want to become known as a "snitch."  Despite her fear, she shared what she had seen because she "felt bad for that boy [who] got killed."

M.G. first talked to the police in her apartment on the same day as the murder.  At the time, she told the police that the shooter's nickname was "JoJo."  Two days later, the police interviewed her at the station.  She said the shooter's name was "JoJo," "Rally," "Raley,"

or "Wally."  She thought he had a brother named Lamar and a cousin named Raven and had dated a friend of her uncle's, but none of these representations about McDaniels's nicknames or relationships turned out to be accurate.

M.G. also told the police that she did not think McDaniels had any tattoos.  In fact, McDaniels has several tattoos, and photographs of them were introduced into evidence.  Among the tattoos was one on his back that said "Mead Street" and others on his forearm and upper arm.  M.G. testified that she could not remember whether the shooter's sleeves were up during the shooting and thus whether she could see his arms.

At a third interview with the police, M.G. was shown a single photograph of McDaniels, and she identified him as the shooter.  Another police sergeant testified that M.G. was shown a single photograph instead of a lineup because after M.G.'s second interview "it was apparent that she provided very in-depth details about Capone in terms of how long she's known him . . . [and] the last time she'd seen him."  M.G. was also shown three sequential photographic lineups, one containing Charles F.'s photograph, one containing Jeffrey F.'s photograph, and one containing W.L.'s photograph.  She identified another man, not Charles F., as the person she saw fighting with Traylor, and she was unable to identify either Jeffrey F. or W.L.

M.G. never saw McDaniels in the neighborhood again in the subsequent year she lived at the recovery center.  She testified that after the murder, she was threatened and told not to testify in the case four times.  This made her feel afraid and reluctant to testify but "the thing that happened was wrong," so she felt compelled to tell her story in court.  M.G. admitted she had unsuccessfully sought compensation for cooperating with the police.

### 3.  Charles F.'s testimony about the murder.

Charles F. testified that he and Traylor started throwing punches at each other while Jeffrey F. watched.  Charles F. could hear other people yelling "'[b]eat his ass.'"  Jeffrey F., on the other hand, denied watching the fight once it was relocated to Mead.  He testified that as soon as he got back to Mead, he went inside 829 Mead.  He claimed he immediately fell "[d]ead asleep" and did not witness or hear the subsequent shooting, even after the prosecutor played a surveillance video that showed him at the scene.

Charles F. claimed that he heard about four gunshots but did not see Traylor get shot, despite the fact the two men were facing each other.  Charles F. also consistently denied, both in his police interviews and at trial, that he had seen the shooter.  He testified that he went inside 829 Mead after the shooting, where several of his family members and W.L. had congregated.  Charles F. claimed he immediately went to sleep and did not see the police arrive on the scene, and he also claimed he did not learn Traylor had died until later.  He testified that he had last seen McDaniels a few days before the shooting and never saw him around the liquor store at Market and Mead again.

8

### 4. *The physical evidence.*

Traylor was shot once in the chest and twice in the back, and he died from his wounds. There were no significant levels of drugs or alcohol in his system. A bullet fragment and three shell casings were found at the scene. A criminalist testified that the same gun fired the casings. Cigarette butts were also collected from the scene, but DNA testing revealed DNA that was not McDaniels's. Neither a beer container nor the gun was recovered. The police were unable to locate the woman who was seen picking up shell casings.

### D. McDaniels's Arrest.

After M.G. identified McDaniels, a warrant was issued, but almost a year passed before he was arrested in Rancho Cordova and taken to Sacramento County jail. He was recorded several times during phone calls and visits at the jail expressing surprise that law enforcement had known where to find him.

McDaniels's girlfriend, who was the only defense witness, had been dating him for several years, and they had two sons together. They lived together in San Pablo at the time of the murder, but she claimed the family moved to Rancho Cordova two months after the murder so McDaniels could work as a contractor with his father. She explained that because McDaniels was dealing drugs on Mead and did not have a job, it was hard to meet their rent in the Bay Area. She denied they had any reason to keep away from Oakland.

Dkt. No. 22-11 at 122-129; Resp't Ex. 8 (footnote in original).

## IV. DISCUSSION

### A. Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). The first prong applies both to questions of law

United States District Court
Northern District of California

and to mixed questions of law and fact, *see id.* at 407-09, while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established Federal law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Under the second prong, *see* 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; T*orres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.

1      § 2254(e)(1).

2          On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating

3      state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."

4      *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

5          In applying the above standards on habeas review, the courts in this Circuit look to the

6      decision of the highest state court to address the merits of the petitioner's claim in a reasoned

7      decision. *See Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706

8      F.3d 1148, 1156 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013); *LaJoie v. Thompson*, 217 F.3d

9      663, 669 n.7 (9th Cir. 2000). When there is no reasoned opinion from the highest state court to

10     consider the petitioner's claims, the courts look to the last reasoned opinion. *Ylst v. Nunnemaker*,

11     501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

12     Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a

13     petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably

14     applied Supreme Court precedent. *See Wilson*, 138 S. Ct. at 1192; *Ylst*, 501 U.S. at 804-06;

15     *LaJoie*, 217 F.3d at 669 n.7.

16         In its partially published disposition issued on April 17, 2018, the state appellate court

17     addressed the merits of Petitioner's claims 6 and 8. *People v. McDaniels*, No. A149015, 22 Cal.

18     App. 5th 420, 423 (1st. Dist. 2018); Dkt. No. 22-11 at 120-145; Resp't Ex 8. Therefore, the last

19     reasoned decision as to these claims is the California Court of Appeal's decision. *See Wilson*, 138

20     S. Ct. at 1192; *Canedy*, 706 F.3d at 1156.

21         Petitioner presented his ineffective assistance of counsel claim (claim 1), his due process

22     claims (claims 2 & 4), and prosecutorial misconduct claims (claims 5 & 7) in his state habeas

23     petitions, Dkt. No. 22-12; Resp't Exs. 11, 13, & 15, which the state supreme court summarily

24     denied, Dkt. No. 22-12; Resp't Ex. 16.

25         Claims 2 and 4 were rejected by both the state superior and appellate courts as

26     procedurally barred. Dkt. No. 22-12 at 402-03, 802-03; Resp't Exs. 12, 14.

27         The state superior court denied claim 1 in a reasoned opinion as to appellate counsel's

28     failure to raise claims 2, 3 and 4. Dkt. No. 22-12 at 403-417; Resp't Ex. 12. The state appellate

United States District Court
Northern District of California

11

court expressly adopted the state superior court's reasoning.  Dkt. No. 22-12 at 802; Resp't Ex. 14.  And the state supreme court issued a summary denial.  Dkt. No. 22-12; Resp't Ex. 16.  Therefore, the last reasoned decision as to these claims is the state superior court's decision.  *See Wilson*, 138 S. Ct. at 1192; *Canedy*, 706 F.3d at 1156.

Both the superior and appellate courts issued reasoned decisions denying claim 5 on the merits, and the state supreme court issued a summary denial.  *See* Dkt. No. 22-12; Resp't Exs. 12, 14 & 16.  This Court therefore looks through the summary denial to the last reasoned state court opinion on claim 5, which in this instance is the opinion of the state appellate court.  *See Wilson*, 138 S. Ct. at 1192.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).  Here, there is no reasoned decision as to Petitioner's remaining claims—claim 7 and his ineffective assistance of counsel claim as to appellate court's failure to raise claim 7 (part of claim 1), which the state supreme court summarily denied.  Dkt. No. 22-12; Resp't Ex. 16.  As such, these claims may be reviewed independently by this Court to determine whether that decision was an objectively unreasonable application of clearly established federal law.  *Plascencia v. Alameida*, 467 F.3d 1190, 1197-98 (9th Cir. 2006) ("Because there is no reasoned state court decision denying this claim, we 'perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.'") (citation omitted); *see Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable.").  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, a federal habeas court must give a heightened level of deference to state court decisions.  *See Hardy v.*

*Cross*, 565 U.S. 65, 66 (2011) (per curiam); *Richter*, 562 U.S. at 97-100; *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam).  As the Court explained, "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  *Felkner*, 562 U.S. at 598 (citation omitted).

With these principles in mind, the Court addresses Petitioner's seven[8] remaining claims: (claim 1) ineffective assistance of appellate counsel; (claim 2) the trial court erred by admitting tainted evidence; (claim 4) the trial court erred in allowing the video reenactment; (claim 5) the prosecutor committed misconduct by allowing false testimony at trial; (claim 6) the trial court erred by denying Petitioner's request for a pinpoint jury instruction about suggestive identification procedures; (claim 7) the prosecutor committed *Griffin* error by relying on Petitioner's jail conversations with his mother and girlfriend as evidence of his consciousness of guilt; and (claim 8) the prosecutor committed *Griffin* error by making reference to the lack of alibi evidence as an indirect comment on Petitioner's failure to testify.

Petitioner's claims will be addressed in a different order than they were presented in his federal petition.  The Court first addresses claims 2 and 4, which Respondent argues are procedurally defaulted and therefore must be dismissed.  Dkt. No. 22-1 at 32-35.  Then the Court will address the remaining five non-defaulted claims in the order that they were presented to the state courts—the direct appeal claims first, followed by the state habeas claims.  Claim 1, the ineffective assistance of appellate counsel claim, will be handled last, as Petitioner claims that his appellate attorney was ineffective for failing to raise his state habeas claims on direct appeal.

**B.      Procedurally Defaulted Claims (Claims 2 and 4)**

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 728 (1991).  Thus, where a state court's rejection of a claim rests upon an independent and adequate state procedural

---

[8] Petitioner originally raised eight claims, but the Court found that claim 3 (the prosecution failed to preserve or turn over exculpatory evidence) was unexhausted and dismissed that claim.  *See* Dkt. No. 18 at 10-11.

ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Noltie v. Peterson*, 9 F.3d 802, 804-05 (9th Cir. 1993).

The state carries the initial burden of adequately pleading "the existence of an independent and adequate state procedural ground as an affirmative defense." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). If the state meets this requirement, the burden then shifts to the petitioner "to place that defense in issue," which the petitioner may do "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Id.*

When the Ninth Circuit has determined that a rule is adequate, the petitioner then must cite cases "demonstrating subsequent inconsistent application" to meet his burden under *Bennett*. *King v. LaMarque*, 464 F.3d 963, 967 (9th Cir. 2006). If the petitioner meets this burden, "the ultimate burden" of proving the adequacy of the state bar rests with the state, which must demonstrate "that the state procedural rule has been regularly and consistently applied in habeas actions." *Bennett*, 322 F.3d at 586.

Here, Petitioner presented claims 2 and 4 for the first time in his state habeas petition, and these claims were rejected by both the state superior and appellate courts as procedurally barred. Dkt. No. 22-12 at 402-03, 802-03; Resp't Exs. 12, 14. The state appellate court stated as follows:

> [Claim 2] is procedurally barred, as it is based on the trial record, and thus it could have been raised on direct appeal. (See *In re Harris* (1993) 5 Cal.4th 813, 829 ["[A]bsent strong justification, issues that could be raised on appeal must initially be so presented, and not on habeas corpus in the first instance. Accordingly, an unjustified failure to present an issue on appeal will generally preclude its consideration in a postconviction petition for a writ of habeas corpus."]; *In re Dixon* (1953) 41 Cal.2d 756, 759 ["[T]he writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction."].)
>
> . . .
>
> [Claim 4] is procedurally barred, as it is based on the trial record, and thus it could have been raised on appeal. (See *In re Harris*, *supra*, 5 Cal.4th at p. 829; *In re Dixon*, *supra*, 41 Cal.2d at p. 759.) Moreover, habeas corpus is not available to review the superior court's rulings regarding the admission or exclusion of evidence. (*In re Lindley* (1947) 29 Cal.2d

United States District Court
Northern District of California

709, 723 ["Nor is habeas corpus an available remedy to review the rulings of the trial court with respect to the admission or exclusion of evidence, or to correct other errors of procedure occurring on the trial."].)

Dkt. No. 22-12 at 802-03; Resp't Ex. 14.  Because the California Supreme Court denied Petitioner's state habeas petition without comment, *see* Dkt. No. 22-12 at 908; Resp't Ex. 16, it is presumed that the state supreme court did not disregard the procedural bar and consider the merits, *see Ylst*, 501 U.S. at 801-06.

The Supreme Court has held that California's rule barring claims that could have been raised on direct appeal, as announced in *In re Dixon*, which was cited in the state appellate court's denial as to claims 2 and 4, is an adequate and independent state ground for the denial of habeas relief.  *See Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016) (per curiam).  Thus, the denial of habeas relief by the California Court of Appeal as to claims 2 and 4—on the ground that these claims that could have been raised on direct appeal—is an independent and adequate state procedural ground requiring denial of subsequent habeas petitions in federal court.  *Id.*  Petitioner has not met his burden "to place that defense in issue." *Bennett*, 322 F.3d at 586.  He has not asserted any "specific factual allegations that demonstrate the inadequacy of the state procedure." *Id.* Therefore, claims 2 and 4 are procedurally defaulted.

Procedural default, however, can be overcome if a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  The "cause standard" requires the petitioner to show that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  "Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule," the Supreme Court has noted that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard." *Murray*, 477 U.S. at 488 (internal quotation and citations omitted).  As to the prejudice prong, Petitioner bears the burden of showing "not merely that the errors at his trial created a *possibility* of prejudice, but that they

1    worked to his *actual* and substantial disadvantage, infecting his entire trial with error of

2    constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).  "To ascertain the

3    level to which such errors taint the constitutional sufficiency of the trial, they must 'be evaluated

4    in the total context of the events at trial.'"  *See Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir.

5    1997) (quoting *Frady*, 456 U.S. at 169).

6         Here, Petitioner is unable to meet his burden of showing cause.  Nor is there anything in

7    the record to suggest he could make the required showing.  In claim 1 of the instant petition,

8    Petitioner contends that his appellate counsel was ineffective for raising claims 2 and 4 on direct

9    appeal.  Although a separately exhausted claim of ineffective assistance of counsel may constitute

10   cause, the error must rise to the level of a constitutional violation as described in *Strickland v.*

11   *Washington*, 466 U.S. 668 (1984).  *Murray v. Carrier*, 477 U.S. at 488-89; *Cockett v. Ray*, 333

12   F.3d 938, 943 (9th Cir. 2003).  The federal habeas court reviews the question whether counsel was

13   ineffective for purposes of the cause inquiry under the "doubly deferential" AEDPA standard of

14   review.  *Walker v. Martel*, 709 F.3d 925, 939-44 & n.5 (9th Cir. 2013).  The California Court of

15   Appeal expressly adopted the state superior court's reasoning for rejecting Petitioner's claim 1,

16   which includes his claim that appellate counsel was ineffective for failing to raise claims 2 and 4

17   on appeal.  *See* Dkt. No. 22-12 at 802-803; Resp't Ex. 14.  Accordingly, this Court deferentially

18   reviews the state superior court's ruling on the ineffectiveness claim in determining whether

19   Petitioner has shown cause to overcome the defaults.  As set forth below in the Court's analysis of

20   claim 1, the state superior court reasonably rejected his ineffectiveness claim (as to appellate

21   counsel's failure to raise claims 2 and 4).  *See infra* DISCUSSION Part IV.C.4.b&d.  Therefore,

22   Petitioner cannot show cause and prejudice to overcome the procedural default of claims 2 and 4.

23   Further, for the same reasons provided in the analysis below of this ineffectiveness claim, claims 2

24   and 4 are meritless.  *See id.*

25        Nor does Petitioner satisfy the second possible exception to procedural default, namely that

26   the Court's failure to consider the claims will result in a fundamental miscarriage of justice.  The

27   "miscarriage of justice" exception is limited to habeas petitioners who can show, based on "new

28   reliable evidence," that "'a constitutional violation has probably resulted in the conviction of one

United States District Court
Northern District of California

16

who is actually innocent.'" *Schlup v. Delo*, 513 U.S. 298, 324-27 (1995) (quoting *Murray*, 477 U.S. at 496); *see, e.g.*, *Wildman v. Johnson*, 261 F.3d 832, 842-43 (9th Cir. 2001) (holding petitioner must establish "factual innocence" in order to show fundamental miscarriage of justice would result from application of procedural default).  Petitioner has not done so here.

Accordingly, the Court finds that claims 2 and 4 are procedurally defaulted.  Because Petitioner has failed to demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice, federal habeas relief is barred on grounds of procedural default.  *Coleman*, 501 U.S. at 750.  Because claims 2 and 4 are procedurally barred, habeas relief on these claims is denied.

**C.    Remaining Non-Defaulted Claims**

**1.    Claim Raised on Direct Appeal: Rejection of Pinpoint Instruction on Suggestiveness of Identification Procedures (Claim 6)**

In claim 6 of the petition, Petitioner contends that the trial court's refusal to give a defense-requested pinpoint instruction on the suggestiveness of identification procedures violated his Fifth, Sixth, and Fourteenth Amendment rights.  Dkt. No. 1 at 26-27.

**a.    State Court Opinion**

The state appellate court summarized and rejected this claim as follows:

1.    Additional facts.

Before trial, McDaniels filed a motion to exclude M.G.'s identification testimony "as being the product of unduly suggestive police procedures."  The trial court denied the motion, a ruling McDaniels does not challenge on appeal.

During a discussion of jury instructions, McDaniels asked the trial court to give the following pinpoint instruction: "'In weighing an eyewitness identification made by a witness, consider any pretrial procedures which may have suggested to the witness that the defendant should be chosen.'"  The court denied the request, agreeing with the prosecutor that CALJIC No. 2.92, which addresses the factors guiding a jury's evaluation of eyewitness identification testimony, was "sufficient."  The court also indicated that the defense could argue that M.G.'s identification was the product of a suggestive procedure in addressing those factors.

In closing argument, McDaniels's trial counsel argued at length that M.G.'s identification was unreliable.  Counsel highlighted that M.G. identified McDaniels after the police showed her only one photograph, "the single most prejudicial way to get an identification."  Counsel argued that although the police attempted to justify this procedure on the basis that M.G. knew McDaniels, the information M.G. provided about McDaniels was mistaken

in several aspects, including as to which names he was known by and whether he had tattoos.

The jury was instructed under CALJIC No. 2.92 that "[i]n determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness'[s] identification of the defendant, including, but not limited to," several factors.  These factors included "[t]he extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness," "[w]hether the witness was able to identify the alleged perpetrator in a photographic or physical lineup," "[w]hether the witness had prior contacts with the alleged perpetrator," and "[w]hether the witness'[s] identification is in fact the product of his or her own recollection."  The jury was also instructed it could consider "[a]ny other evidence relating to the witness'[s] ability to make an identification."

2.  Discussion.

A trial court is required to instruct the jury " ' "on the general principles of law governing the case." ' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 434.)  In particular, a "[d]efendant is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230.)  "[A]n explanation of the *effects* of those factors," however, "is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143.)  Our state Supreme Court has "noted that CALJIC No. 2.92 normally provides sufficient guidance on the subject of eyewitness identification factors." (*Johnson*, at pp. 1230-1231.)

Upon request, a defendant is also "'entitled to adequate instructions on the defense theory of the case' if supported by the law and evidence." (*People v. Bell*, *supra*, 179 Cal.App.4th at p. 434.)  The instruction requested here was a pinpoint instruction, which "relate[s] particular facts to a legal issue in the case or 'pinpoint[s]' the crux of a defendant's case." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119; see also *People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489.)  A pinpoint instruction need be given only upon request, and only if "there is evidence supportive of the theory" and the "'proffered instruction . . . is [not] an incorrect statement of law,' argumentative, duplicative, or confusing." (*Saille*, at p. 1119; *Bell*, at pp. 434-435.)  We review claims of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

McDaniels quotes the governing legal standards at length, but his opening brief's only explanation of why the requested instruction should have been given is that it "properly focused on the 'crux' of the defense, which was that [M.G.] had mistakenly albeit honestly identified [him] in error."  Although we accept that there was substantial evidence to support the instruction, we agree with the Attorney General that it was argumentative and duplicative.  It was argumentative because it implied the police had used an improper identification procedure, by referring to "pretrial procedures which may have suggested to the witness that the defendant should be chosen."  And it was duplicative because the jury was already instructed that it could consider "[w]hether the witness'[s] identification is in fact the product of his or her own recollection" and "[a]ny other evidence relating to the witness'[s] ability to make an identification."

In arguing otherwise in his reply brief, McDaniels relies on two decisions.  He cites *People v. Jackson* (1996) 13 Cal.4th 1164 (*Jackson*) in contending the requested instruction was not argumentative.  *Jackson* rejected a defendant's claim that CALJIC Nos. 2.03, 2.04, 2.06, and 2.52 were improper pinpoint instructions, observing that they "made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate

United States District Court
Northern District of California

consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior." (*Jackson*, at pp. 1222-1224.)  Thus, the "instructions did not improperly endorse the prosecution's theory or lessen its burden of proof."  (*Id.* at p. 1224.)

McDaniels offers the conclusory assertion that "[i]f the 'consciousness of guilt' instructions at issue in *Jackson* were not 'argumentative,' [his] proposed instruction was not itself 'argumentative,'" but he does not explain how the *Jackson* instructions are analogous to the instruction he proposed.  True, all these instructions implied a particular factor weighed in favor of a particular finding: the *Jackson* instructions posited that a defendant's flight or escape indicates guilt, and the proposed instruction posited that a suggestive identification procedure indicates a false identification.  All the instructions at issue in *Jackson*, however, included language explicitly informing jurors that a particular factor was "not sufficient" alone to prove guilt and that they had to decide what "weight" to give the factor.  (CALJIC Nos. 2.03, 2.04, 2.06, 2.52.)  Here, in contrast, the proposed instruction gave no guidance on how an identification procedure's suggestiveness should impact the jury's overall analysis.

Second, McDaniels cites *People v. Farnam* (2002) 28 Cal.4th 107 in claiming the requested instruction was not duplicative.  *Farnam* affirmed a modified version of CALJIC No. 2.06 that gave a specific example of how the defendant could have attempted to suppress evidence, "'by concealing evidence in his attempt to refuse to comply with the court order requiring his blood and hair samples.'"  (*Farnam*, at pp. 164-165 & fn. 28.)  But the *Farnam* defendant did not contend the instruction was duplicative, and the decision did not address that issue.  Therefore, *Farnam* provides no support for McDaniels's position.  (See *People v. Knoller* (2007) 41 Cal.4th 139, 155 [" ' "An opinion is not authority for propositions not considered" ' "].)  McDaniels fails to convince us that the trial court erred by refusing to give the requested instruction.

Even if the trial court had erred, the error was harmless.  McDaniels argues that we should apply the standard from *Chapman v. California* (1967) 386 U.S. 18, 24, under which we ask whether the error was harmless beyond a reasonable doubt.  *Chapman* applies "[w]hen the jury is 'misinstructed on an element of the offense,'" but the failure to give a requested pinpoint instruction is "state law error" that requires reversal "only if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'" under *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Wilkins* (2013) 56 Cal.4th 333, 348-349.)  McDaniels does not explain how the proposed instruction bore on an element of the charged offenses or how the trial court's failure to give it violated his right to present a complete defense.  Therefore, we will consider whether it is reasonably probable that he would have received a more favorable verdict had the court given the instruction.

We agree with the Attorney General that any error was not prejudicial under this standard.  Evidence was admitted that M.G. identified McDaniels from a single photograph but could not identify other participants in the fight in sequential lineups, and nothing prevented the jury from considering these facts in determining what weight to give her identification.  Indeed, the jury was instructed under CALJIC No. 2.92 to consider a non-exclusive list of factors and "[a]ny other evidence relating to the witness'[s] ability to make an identification."  And in closing, McDaniels's trial counsel argued at length that M.G.'s identification was unreliable, including because it was the product of a suggestive procedure.  Therefore, "[i]t is unlikely the jury hearing the evidence, the instructions given[,] and the argument of counsel would have failed to give the defendant's position full consideration."  (*People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1665 [holding, on similar grounds, that any error in refusing to give pinpoint instruction was harmless]; see also *People v. Ervin* (2000) 22 Cal.4th 48, 91.)

United States District Court
Northern District of California

Dkt. No. 22-11 at 129-33; Resp't Ex. 8.

### b.   Applicable Federal Law

A defendant is entitled to an instruction on a theory of defense only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation marks omitted). Due process does not require an instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611 (1982) (holding instruction on lesser-included offense required only "when the evidence warrants such an instruction").  A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so infect the trial that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment.  *See id.*

The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).  "A 'theory of defense' instruction need not be given when it is simply a recitation of the facts told from the defendant's perspective."  *United States v. Parker*, 991 F.2d 1493, 1497 (9th Cir. 1993) (*citing United States v. Nevitt*, 563 F.2d 406, 409 (9th Cir. 1977)).  It is proper to reject a proposed instruction that is "more like a closing argument than a statement of applicable law."  *Id.*

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).  An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory.  *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980).  In other words, the Court determines whether what was given was so prejudicial as to infect the entire trial and deny due process.  *See id.*

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v. Endell*, 850 F.2d at 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  Thus, a habeas petitioner whose claim involves a failure to give a

1    particular instruction bears an "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616,

2    624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).  The significance of the omission of

3    such an instruction may be evaluated by comparison with the instructions that were given.

4    *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156);

5    *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that

6    application of the wrong statute at his sentencing infected the proceeding with the jury's potential

7    confusion regarding its discretion to impose a life or death sentence).

8                                    **c.    Analysis**

9        Petitioner contends that defendants are "entitled, on request, to instructions that 'pinpoint'

10   the theory of the defense case," and that such "instructions may direct the jury's attention to

11   evidence that could raise a reasonable doubt about the defendant's guilt, or they may pinpoint the

12   crux of the defendant's case."  Dkt. No. 1 at 27.  He is challenging the trial court's refusal to give

13   the pinpoint instruction on the suggestiveness of identification procedures.  *Id.* at 26-27.

14       First, the state appellate court found no constitutional error in the trial court's refusal to

15   give the requested pinpoint instruction, and observed that, if there was any error, it was at most

16   state law error.  Dkt. No. 22-11 at 133; Resp't Ex. 8.  State law instructional error is not a basis for

17   federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("it is not the province of a

18   federal habeas court to reexamine state-court determinations on state-law questions"); *Mendez v.*

19   *Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the last word on the interpretation

20   of state law.").  In any event, the state appellate court found no constitutional error and noted that

21   Petitioner was afforded the opportunity to present a complete defense in that his trial counsel was

22   afforded the opportunity to argue at length that M.G.'s identification was unreliable.  Dkt. No. 22-

23   11 at 130; Resp't Ex. 8.  In addition, the jury was instructed regarding eyewitness identification

24   testimony and how to weigh its credibility under CALJIC No. 2.92.  *Id.*  The state appellate court

25   pointed out that the trial court's instructions already allowed the jury to consider "a non-exclusive

26   list of factors and '[a]ny other evidence relating to the witness['s] ability to make an

27   identification."  *Id.* at 133.  Based on this record, the state appellate court reasonably found that

28   Petitioner had a meaningful opportunity to pinpoint his theory, and pointed out that his trial

United States District Court
Northern District of California

United States District Court
Northern District of California

1   counsel "argue[d] at length that M.G.'s identification was unreliable, including because it was the

2   product of suggestive procedure." *Id.* The state appellate court was reasonable to conclude that it

3   was "unlikely the jury hearing the evidence, the instructions given[,] and the argument of counsel

4   would have failed to give [Petitioner's] position full consideration." *See Henderson*, 431 U.S. at

5   156 ("[S]ince it is logical to assume that the jurors would have responded to an instruction on

6   causation consistently with their determination of the issues that were comprehensively explained,

7   it is equally logical to conclude that such an instruction would not have affected their verdict," and

8   thus, no due process violation occurred).

9        Second, federal habeas relief is unavailable on claim 6 because no clearly established

10  federal law, as determined by the Supreme Court, holds that a state court's failure to give a

11  pinpoint jury instruction on the defense theory of the case violates a criminal defendant's due

12  process right to be afforded a meaningful opportunity to present a complete defense. Therefore,

13  the state appellate court's rejection of Petitioner's claim was not "contrary to," or "an

14  unreasonable application of, clearly established Federal law, as determined by the Supreme Court

15  of the United States." 28 U.S.C. § 2254(d).

16       Finally, even if constitutional instructional error occurred, Petitioner has failed to satisfy

17  his burden of showing actual prejudice under *Brecht*. While Petitioner focuses exclusively on the

18  single photo procedure to question the reliability of M.G.'s identification, her identification was

19  credible in several important respects. While M.G. did not know Petitioner's name and was

20  uncertain of his nickname and whether he had tattoos, 1 RT 202, 205-206, 210, she testified that

21  she did know him by sight from the neighborhood and from her personal interactions with him. 1

22  RT 126-131. Before she even viewed the photograph of Petitioner, her initial description of the

23  shooter at the scene and during her first police interview closely matched that of Petitioner. 1 RT

24  126-127, 164, 166-168; 3 RT 106. Additionally, during her first police interview, when shown

25  pictures of other people, she was certain none of them was the shooter. 1 RT 167-175; Aug. CT

26  (People's Ex. 6A [transcript of first interview]). In contrast, during a second police interview,

27  when finally shown a picture of Petitioner, she unequivocally identified him as the shooter. 1 RT

28  177-178; 3 RT 77-78; Aug. CT (People's Ex. 11A [transcript of second interview]). She never

22

wavered in her identification of Petitioner as the shooter, 1 RT 121, 156, 207, despite her initial reluctance to talk to police because she was afraid of being labeled a "snitch," 1 RT 162-165, and her later receipt of threats from people who told her not to testify.  1 RT 188-191, 220-222. Further, M.G. was not the only eyewitness to identify Petitioner as the shooter.  W.L., who knew Petitioner well, having interacted with him at 829 Mead, also positively identified him as the shooter.  Moreover, like M.G., W.L. remained steadfast in his identification, and testified notwithstanding his expressed fear for his own safety.  Based on the evidence, other instructions given to the jury, and the defense argument, Petitioner cannot show that the lack of a pinpoint instruction had a substantial and injurious effect or influence on the jury's verdict.

Accordingly, Petitioner is not entitled to habeas relief on claim 6.

### 2. Claims Raised on Direct Appeal/State Habeas: Prosecutorial Misconduct Based on *Griffin* Errors (Claims 7 and 8)

Claims 7 and 8 of the petition both relate to *Griffin* error based on the prosecutor improperly commenting at closing on Petitioner's failure to testify in violation of the Fifth Amendment and *Griffin*.  Dkt. No. 1 at 28-31.  The comments Petitioner challenges fall into two categories: comments on the absence of an alibi (claim 8) and a reference to Petitioner's jail conversations with his mother and girlfriend as evidence of his consciousness of guilt (claim 7). *See id.*  Petitioner raised the former claim on direct review and the latter on state habeas, and the Court will address them below in that order.

### a. Applicable Federal Law

The Fifth Amendment prohibits the prosecutor from commenting to the jury on the defendant's failure to take the stand in his own defense.  *Griffin*, 380 U.S. at 615.  Where a prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, or to treat the defendant's silence as substantive evidence of guilt, the defendant's privilege against compulsory self-incrimination is violated.  *See id*.

A prosecutor may not make direct reference to the defendant's failure to testify as substantive evidence of his guilt.  *See id.* at 613; *United States v. Robinson*, 485 U.S. 25, 31-32 (1988) (observing that *Griffin* is violated where the prosecutor asks the jury to draw an adverse

United States District Court
Northern District of California

inference from the defendant's silence).  However, it is permissible for the prosecution to address

defense arguments, and an indirect reference to the defendant's silence violates *Griffin* only "'if it

is manifestly intended to call attention to the defendant's failure to testify, or is of such a character

that the jury would naturally and necessarily take it to be a comment on the failure to testify.'"

*Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (quoting *Lincoln v. Sunn*, 807 F.2d 805, 810

(9th Cir. 1987)).  This type of commentary by the prosecutor requires reversal only if "(1) the

commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for

the conviction; and (3) . . . there is evidence that could have supported acquittal." *Jeffries v.

Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994).  Put differently,

such improper commentary warrants reversal only if it appears that it may have affected the

verdict.  *See Lincoln*, 807 F.2d at 809.

Where the prosecutor's reference to the defendant's opportunity to testify is a fair response

to a claim made by the defendant or his counsel, there is no violation of the privilege against self-

incrimination.  *See United States v. Robinson*, 485 U.S. 25, 30-34 (1988) (prosecutor's reference

to defendant's opportunity to testify, made to rebut closing argument by defense counsel that

government had breached duty to be fair and permit defendant to explain, was not constitutional

error under *Griffin*).

### b.   Commenting on Petitioner's Lack of Alibi Evidence (Claim 8)

In his first claim of *Griffin* error (claim 8), which was raised on direct appeal, Petitioner

specifically challenges the prosecutor's comments on the absence of an alibi.  Dkt. No. 1 at 30-31.

### i.   State Court Opinion

The California Court of Appeal summarized the factual background and rejected the

*Griffin* error claim as follows:

1.   Additional facts.

Before the prosecutor gave his rebuttal argument, he provided McDaniels's trial counsel
with a copy of *People v. Morris*, which addressed a claim of *Griffin* error.  (*People v.
Morris* (1988) 46 Cal.3d 1, 35 (*Morris*), disapproved on other grounds by *In re Sassounian*
(1995) 9 Cal.4th 535, 543, fn. 5.)  Defense counsel objected "to any reference to [her]
client's silence" and "any argument about [her] client not calling any witnesses . . . that he
could have called."  The prosecutor responded that *Morris* was good law and he merely

United States District Court
Northern District of California

wished to avoid "a bunch of objections while . . . reading a portion of [his] argument." The trial court indicated the prosecutor could comment on the state of the evidence.

Closely following language approved in *Morris*,[FN 6] the prosecutor argued in rebuttal as follows:

Everything comes together, ladies and gentlemen.  The bits of the puzzle come together to fit and point to Mr. Alpacino McDaniels.  And nothing points to anyone else, anybody else.  Keep in mind, that there is not a shred of evidence, not a shred to suggest that anyone else did the killing [¶] . . . [¶] other than Alpacino McDaniels.  Not a shred.  There's not a shred of evidence to indicate that Alpacino McDaniels was anywhere else on the morning of July 6th, 2013.  Nothing.

[¶] . . . [¶]

Put yourself in the position of being a defendant.  You can bet your boots that if you had anything to offer by way of evidence, by way of alibi, that you would offer it.  Be assured of that.  Be assured of the fact that any defense attorney would make sure that if any such evidence existed you would have it.  You don't have it.

What are we left with, ladies and gentlemen?  Two identifications of Alpacino McDaniels as the shooter, independent corroborative, circumstantial evidence to prove that those identifications are correct.

[FN 6:] *Morris* held that there was no *Griffin* error where the prosecutor argued as follows: "'Everything else comes together.  The bits of the puzzle come together to fit the point of Mr. Morris. And nothing points at anyone else.  [¶]  'Keep in mind that there is not a shred of evidence.  Not a shred to suggest that anybody else did the killing, other than Oscar Lee Morris.  Not a shred.  [¶]  'There is not a shred of evidence to indicate that Oscar Morris was anywhere else on the morning of September 3, 1978.  [¶]  'Nothing.  Put yourself in the position of being a defendant, and you can bet your boots that if you had anything to offer by way of evidence, by way of alibi, that you would offer it.  Be assured of that.  Be assured of the fact that any defense attorney would make sure that if any such evidence existed, you would have it.  You don't have it.  [¶]  'There is nothing, nothing to gainsay Mr. West, Mr. Billdt, Mr. Johnson, and all of this evidence comes directly at Oscar Morris.'"  (*Morris*, *supra*, 46 Cal.3d at pp. 35-36.)

2.      Discussion.

In *Griffin*, the United States Supreme Court held that the federal Constitution "forbids . . . comment by the prosecution on the accused's silence."  (*Griffin*, *supra*, 380 U.S. at p. 615.)  "Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her [own] behalf."  (*People v. Hughes* (2002) 27 Cal.4th 287, 371.)  "But although ' "*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand," ' " the decision does not prohibit " ' "comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses." ' "  (*Id.* at p. 372.)

"To determine whether a prosecutor's comment violated *Griffin*, a reviewing court must decide whether there is a 'reasonable likelihood' that the jury construed the remark as a commentary on the defendant's failure to testify." (*People v. Carter* (2005) 36 Cal.4th 1215, 1282.)  In conducting this review a court " ' "do[es] not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.)

We begin by agreeing with McDaniels that the rebuttal argument's similarity to the statements approved in *Morris* does not conclusively establish there was no *Griffin* error.  Although the similarity may establish that the passage the prosecutor read was not an improper *direct* comment on McDaniels's silence, McDaniels does not contend otherwise.  Instead, he claims the passage was an improper *indirect* comment on his silence because "[t]here was no logical and non-hypothetical witness other than [himself] who could have been produced by the defense to establish 'that [he] was [some]where else on the morning of July 6th, 2013.'" (Italics omitted.)  Whether there is a reasonable likelihood that a jury interpreted a prosecutor's argument to be an indirect comment on a defendant's silence turns on the particular evidence presented and is necessarily fact-specific, and in theory the argument approved in *Morris* could be improper in a case with different facts.

Here, McDaniels argues that given nearly a year passed between the murder and his arrest, he was in no position to "dredg[e] up" any "potential 'alibi' witness[es]."  But depending on what he was supposedly doing at the time of the murder, testimony from any number of witnesses, not to mention other types of evidence, might have been introduced to establish that he was not on Mead when the murder occurred.  Indeed, he and his girlfriend were living together at the time of the murder, and she testified that he generally came home at night but that it was also "common" for him to stay at his mother's house.  Given that the murder happened early on a Saturday morning, the jury could have reasonably wondered why neither McDaniels's girlfriend nor his mother could provide him with an alibi.

In any event, McDaniels does not provide any authority to support his position that the prosecutor could not comment on his failure to provide an alibi absent the existence of a specific, "non-speculative" witness who could have given him one.  In *People v. Szeto* (1981) 29 Cal.3d 20, the Supreme Court held there was no *Griffin* error when the prosecutor "merely pointed out that the defense had not produced alibi witnesses for the crucial period." (*Id.* at p. 34; see also *People v. Echevarria* (1992) 11 Cal.App.4th 444, 452 [no *Griffin* error where prosecutor observed that none of the defense witnesses could tell jury "'where [the defendant] was that night'"].)  Under *Szeto*, a prosecutor is not precluded from remarking on the lack of alibi evidence simply because the defense has not indicated what the alibi might be, and thus which specific witnesses or other evidence might be available to support it.  McDaniels fails to convince us that the prosecutor's rebuttal argument here violated *Griffin*.

Dkt. No. 22-11 at 134-36; Resp't Ex. 8 (footnote in original).

### ii.    Analysis

The California Court of Appeal's rejection of claim 8 was not contrary to or an

unreasonable application of *Griffin*.  The prosecutor's comments did not refer directly to

1    Petitioner's failure to testify but instead to the absence of any defense evidence.  Dkt. No. 22-11 at

2    134-35; Resp't Ex. 8.  Specifically, the prosecutor referred to the failure of the defense and the

3    defense attorney to produce evidence of an alibi and the fact that no one testified to Petitioner's

4    whereabouts at the time of the crime.  There is a distinction between a comment on the failure of

5    the defense to present exculpatory evidence or call a logical witness and a comment on the failure

6    of the defendant to testify on his own behalf.  *See United States v. Mende*, 43 F.3d 1298, 1300 (9th

7    Cir. 1995) (recognizing that "a prosecutor may properly comment upon the defendant's failure to

8    present exculpatory evidence, as long as it is not phrased to call attention to defendant's own

9    failure to testify.").  The state appellate court found that Petitioner provided no authority to

10   support his position that the prosecutor could not comment on the failure of the defense to provide

11   alibi evidence or witnesses.  Dkt. No. 22-11 at 136; Resp't Ex. 8.  Because the prosecutor's

12   comments avoided any direct reference to Petitioner's silence, the state appellate court was

13   reasonable in finding that the comments did not violate *Griffin*.  *See United States v. Castillo*, 866

14   F.2d 1071, 1083 (9th Cir. 1988).  And even if the prosecutor's comments could be construed as

15   *indirect* references to Petitioner's silence, there still was no *Griffin* error because the comments

16   here neither were "manifestly intended to call attention to the defendant's failure to testify" nor

17   "of such a character that the jury would naturally and necessarily take [them] to be a comment on

18   the failure to testify."  *See Hovey*, 458 F.3d at 912 (quoting *Lincoln*, 807 F.2d at 810).  The

19   prosecutor's comments regarding the defense's failure to produce alibi evidence did not

20   necessarily implicate Petitioner's silence, as Petitioner was *not* the only person who could provide

21   information about his whereabouts at the time of the crime.  *See Lincoln*, 807 F.2d 810 ("Courts

22   have distinguished between those cases in which the defendant is the sole witness who could

23   possibly offer evidence on a particular issue, and those cases in which the information is available

24   from other defense witnesses as well.").  The state appellate court noted that "depending on what

25   [Petitioner] was supposedly doing at the time of the murder, testimony from any number of

26   witnesses, not to mention other types of evidence, might have been introduced to establish that he

27   was not on Mead when the murder occurred."  Dkt. No. 22-11 at 136; Resp't Ex. 8.  Therefore, to

28   the extent that the prosecutor's comments arguably amounted to indirect references to Petitioner's

United States District Court
Northern District of California

silence, the state appellate court reasonably concluded that reversal was not warranted because those comments were limited to the state of the evidence (i.e., the lack of alibi evidence) and did not stress Petitioner's failure to testify as a basis for the conviction. *See Jeffries*, 5 F.3d at 1192.

Accordingly, Petitioner is not entitled to habeas relief on claim 8.

### c.   Commenting on Petitioner's Jail Conversations as Evidence of His Consciousness of Guilt (Claim 7)

The second claim of *Griffin* error (claim 7) relates to the prosecutor's reliance on Petitioner's jail conversations with his mother and girlfriend as evidence of his consciousness of guilt. Dkt. No. 1 at 28-29.

### i.   State Court Summary Denial

Petitioner raised this second claim of *Griffin* error for the first time on state habeas. Dkt. No. 22-12; Resp't Exs. 11, 13, 15. The state superior and appellate courts, however, mistakenly believed Petitioner had raised both *Griffin* claims on direct appeal, and accordingly found both claims barred on habeas. Dkt. No. 22-12; Resp't Exs. 12, 14. The California Supreme Court issued a summary denial. Dkt. No. 22-12; Resp't Ex. 16. Because it is clear that Petitioner did not raise his second *Griffin* claim on direct appeal, the inapplicability of the procedural bar imposed by the superior and appellate courts is plain. Accordingly, the usual "look through" presumption should not apply to claim 7, *see Wilson*, 138 S. Ct. at 1192, and instead the California Supreme Court's summary denial of the claim, which constitutes a merits decision, should be reviewed deferentially on federal habeas. In conducting its independent review of the record, this Court must determine whether the state supreme court's summary denial was objectively reasonable. *See Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853.

### ii.   Factual Background of Claim

During closing argument, the prosecutor made the following comments when he relied on statements Petitioner made during jail conversations as evidence of his consciousness of guilt:

[Prosecutor]: The defendant in this case made admissions during his jail calls. And why you have this instruction is those statements—they refer to the statements he makes to his family after he's arrested. These are the "How did they find me" discussions that have a tendency, when you combine them with the other evidence, to prove that the defendant is guilty of murder and felon in possession of a gun.

4RT 646.

> [Prosecutor]: And this theory, ladies and gentlemen, that the defendant left Oakland, where he's seen every single day on Mead, after the murder and goes to Rancho Cordova to be away from Oakland to hide, that's confirmed when we listen to the jail calls.

> And I passed the transcripts out because these are difficult to decipher. But when you listen to these clips that I've played before, ladies and gentlemen, listen to the concern of the defendant in the two days after he's arrested when he's in the custody of the Sacramento County Sheriff. He's not concerned about the fact that he was arrested. He's not concerned about being arrested for murder. He's concerned about how he got caught. How did they find me?

> (Tape playing.)

> [Prosecutor]: This third clip, ladies and gentlemen, is a jail visit. It's not a jail call. And the funny part of this jail visit between the defendant and Trayaina Hawkins is that last week, on Tuesday, Ms. Hawkins told you that during her communications with the defendant that she "wasn't concerned about how we were found. I was just concerned about why he was in jail." She told you that they never talked about the defendant providing a fake name to the neighbor.

> (Tape playing.)

> [Prosecutor]: This is the final jail call clip.

> (Tape playing.)

4 RT 674-675.

> [Prosecutor]: Ladies and gentlemen, when you're not hiding, you're not upset when someone finds you. You're not disappointed. In June 2014, Mr. McDaniels had no other reason to be found besides this case. There was no reason for him to be disappointed when the police found him. His focus should have been, why was I arrested? Why am I in custody? But he's not. The logical inference, what makes sense, ladies and gentlemen, he's hiding, does not want to be caught by the police.

> Why is this logical? Why does this make sense? Because it's a sole concern he has, like my daughter in the drapes, the question he asks when he's found is, how did they find me? A man who deals drugs the entire time Trayiana Hawkins knew him for 10 years, leaves Oakland, goes to Rancho Cordova. He's providing fake names to neighbors. Why? What is the logical inference? Because he committed a murder in Oakland, and he doesn't want to get caught. That makes sense, ladies and gentlemen.

4 RT 719-720.

> [Prosecutor]: And, ladies and gentlemen, let me ask you, is there any worse accusation than being accused of murder? Probably it's got to be in the top five. Police say you took

someone's life.  You didn't do it.  You're the wrong person, and you're taken to jail and your family comes to visit.  They ask you, "What are you doing in here?"  And you're accused of—falsely accused and you didn't do it.  Your family comes and says this question.  "When are you coming home?"

Assuming any one of you would tell a family member, "I'm coming home as soon as this is figured out.  As soon as I get an attorney and figure this out, I'm coming home.  This is a huge mistake."

How about someone who knows they're guilty?

(Tape playing.)

[Prosecutor]: It's indeed a tragedy, ladies and gentlemen.  All this over a fistfight.  Not once but two times, I might not never get to come home.  What makes sense?  What does logic dictate, ladies and gentlemen?  He's telling the truth to his son.  He knows he's murdered someone 11 months ago.

4 RT 720-721.

### iii.    Analysis

The state supreme court could have reasonably determined, based on the record before it, that the prosecutor's references to Petitioner's jail conversations were neither direct nor indirect comments on his failure to testify.  Instead, the state supreme court could have reasonably rejected this claim considering the record shows that the prosecutor relied on the objective, plain meaning of Petitioner's statements (as evidence of his consciousness of guilt), and did not specifically argue that Petitioner failed to testify.  Even if the prosecutor had argued that the defense failed to present evidence supporting a contrary meaning, the state supreme court could have reasonably found that Petitioner was not the only one who could have testified in this regard.  Rather, those family members he had conversations with at the jail—his mother and girlfriend—were equally capable of testifying about their understanding of their conversations with Petitioner.  Accordingly, the state supreme court could have reasonably concluded that any comment made by the prosecutor relating to the jail conversations was not "manifestly intended to call attention to the defendant's failure to testify, or [wa]s of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'"  *Hovey*, 458 F.3d at 912.  Nor was any error prejudicial under *Brecht*, as there was ample evidence of Petitioner's guilt other than his jail conversations.

1    Petitioner is therefore not entitled to federal habeas relief on claim 7.

### 3. Claim Raised on State Habeas: Prosecutorial Misconduct for Knowingly Presenting False Testimony (Claim 5)

In claim 5 of the petition, Petitioner contends that the prosecutor knowingly presented false testimony about the shooting by M.G. and W.L..  Dkt. No. 1 at 24-25.  Petitioner presented this claim for the first time on state habeas.  *See* Resp't Exs. 11, 13, 15.  Both the superior and appellate courts issued reasoned decisions denying claim 5 on the merits.  *See* Dkt. No. 22-12; Resp't Exs. 12, 14.  The California Supreme Court issued a summary denial.  See Dkt. No. 22-12; Resp't Ex. 16.  This Court therefore looks through the summary denial to the last reasoned state court opinion on the claim, which in this instance is the opinion of the state appellate court.  *See Wilson*, 138 S. Ct. at 1192.

### a. State Court Opinion

The California Court of Appeal rejected this claim as follows:

> The petition is denied as to this ground for failure to state a prima facie case.  (See *In re Richards* (2012) 55 Cal.4th 948, 962 [habeas relief available under Pen. Code § 1473, subd. (b) if petitioner shows "some piece of evidence at trial was actually false, and . . . it is reasonably probable that without that evidence the verdict would have been different . . . ."]; *People v. Avila* (2009) 46 Cal.4th 680, 712 ["Any inconsistency between Montoya's pretrial statements and trial testimony does not ineluctably demonstrate his trial testimony was false, or that the prosecutor knew it was false."]; *People v. Riel* (2000) 22 Cal.4th 1153, 1181-1182 [prosecutor may call witnesses of dubious veracity without committing misconduct].)

Dkt. No. 22-12 at 803; Resp't Ex. 14.  The state appellate court's finding that a habeas petitioner failed to state a prima facie case is a merits decision that is entitled to deference under AEDPA. *Cullen v. Pinholster*, 563 U.S. 170, 188 n.12 (2011).

### b. Applicable Federal Law

When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, it has been consistently held that such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  *See United States v. Agurs*, 427 U.S. 97, 103 (1976).  "A conviction obtained using knowingly perjured testimony violates due process, even if the witness's perjured testimony goes only to his

31

credibility as a witness and not to the defendant's guilt." *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (citing *Mooney v. Holohan*, 294 U.S. 103, 211 (1935)). "To prevail on a claim [that the prosecution offered false or misleading testimony], the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *See United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). A petitioner must establish a factual basis for attributing to the government knowledge that the testimony was perjured. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).

### c.    Analysis

Petitioner argues that the prosecutor solicited false testimony from M.G. and W.L. Dkt. No. 1 at 24. Petitioner claims that M.G.'s identification of him as the shooter was false because it conflicted with her statements to police regarding what she believed were the shooter's nicknames and relationships with other people. *Id.* Petitioner alleges that W.L.'s description of the shooting was also false because he was under the influence of drugs at the time, and was motivated to make a deal with police after being arrested for domestic violence. *Id.* Petitioner asserts that the prosecutor "knew all of the[se] things" and therefore "knowingly used false testimony for both of [these] witnesses." *Id.*

In finding that claim 5 failed to state a prima facia case, the California Court of Appeal reasonably concluded that Petitioner failed to show that the witnesses' testimony was "actually false" or that the prosecutor knew it was false. *See* Dkt. No. 22-12 at 803; Resp't Ex. 14. The only evidence Petitioner has presented to support this claim are his own allegations of a constitutional violation based mainly on the inconsistencies in M.G. and W.L.'s testimonies. However, inconsistencies in testimony are insufficient to establish that the prosecutor knowingly used perjured testimony. *United States v. Zuno-Arce*, 44 F.3d 1420, 1422-23 (9th Cir. 1995) (as amended) (prosecutor's presentation of inconsistent testimony does not establish a constitutional violation), *overruled in part on other grounds by Valerio v. Crawford*, 306 F.3d 742, 764 (9th Cir. 2002) (en banc). In such cases, the question whether witnesses lied or erred in their perceptions or judgments is properly left to the fact finder. *See id.*; *see also United States v. Scheffer*, 523 U.S.

303, 313 (1998) ("A fundamental premise of our criminal trial system is that the *jury* is the lie detector.") (internal quotations omitted; emphasis in original).

No evidence in the record establishes that these witnesses' testimony was false. The record shows that the jury was well aware of the inconsistencies in M.G.'s testimony regarding her familiarity with Petitioner, *see* 1 RT 202, 205-206, 210, W.L.'s testimony that he had been drinking alcohol and smoking marijuana in the hours leading up to the shooting, *see* 2 RT 54, 73-74, and W.L.'s testimony that he offered to give police information about the shooting in exchange for leniency in his own criminal case, *see* 2 RT 59-61; 3RT 27. However, none of this shows that M.G.'s and W.L.'s testimony regarding the shooting was actually false, or that the prosecutor should have known (or even had reason to believe) it was false. Accordingly, the state appellate court reasonably concluded that Petitioner did not sustain his burden of establishing the elements of his claim, i.e., that M.G. and W.L. gave false testimony, and that the prosecutor knew it was false. Dkt. No. 22-12 at 803; Resp't Ex. 14. Petitioner is not entitled to federal habeas relief on claim 5.

### 4. Claim Raised on State Habeas: Ineffective Assistance of Appellate Counsel for Failing to Raise Habeas Claims on Appeal (Claim 1)

In claim 1, Petitioner contends appellate counsel was ineffective for failing to raise his state habeas claims (claims 2, 3, 4, 5 and 7) on direct appeal.[9] Dkt. No. 1 at 17-18. On habeas, the state superior court denied this claim in a reasoned opinion as to appellate counsel's failure to raise claims 2, 3, 4 and 5. Dkt. No. 22-12 at 403-417; Resp't Ex. 12. The state appellate court expressly adopted the state superior court's reasoning. Dkt. No. 22-12 at 802; Resp't Ex. 14. And the state supreme court issued a summary denial. Dkt. No. 22-12; Resp't Ex. 16. Therefore, in reviewing claim 1 as to appellate counsel's failure to raise claims 2, 3, 4, and 5, the Court looks through the state appellate and supreme courts' summary denials to the state superior court's reasoned opinion. *See Wilson*, 138 S. Ct. at 1192. The state superior court mistakenly found that claim 7 (the second *Griffin* claim) was raised on direct appeal, so it did not consider claim 1 as to

---

[9] As explained above, claims 6 and 8 were raised on direct appeal. *See supra* DISCUSSION Part IV.C.1 and IV.C.2.b.

United States District Court
Northern District of California

appellate counsel's failure to raise to claim 7. Dkt. No. 22-12 at 403; Resp't Ex. 12. Instead, Petitioner raised this ground of claim 1 in his state habeas petition with the California Supreme Court, which denied it summarily. Because the state supreme court gave no reasoned explanation of its decision as to appellate counsel's failure to raise claim 7, this Court should conduct "an independent review of the record" to determine whether the state supreme court's decision was an objectively unreasonable application of clearly established federal law. *Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853.

### a.   Applicable Federal Law

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See Miller*, 882 F.2d at 1434. Declining to raise a weak issue thus often will meet an objective standard of competence and cause no prejudice. *Id.*

### b.   Ineffectiveness for Failing to Raise Claim 2

The state superior court based its denial of Petitioner's ineffective assistance claim for appellate counsel's failure to raise claim 2 (trial court erred by admitting tainted identification evidence) on the following analysis:

1
2

*Appellate Counsel Was Not Ineffective For Failing To Challenge The Trial Court's Denial Of The Motion To Exclude M.G.'s Testimony.*

3

In arguing that the trial court erred in declining to give a requested defense instruction relating to the suggestive identification procedures used with M.G., Petitioner's appellate counsel discussed the trial court's denial of the motion to exclude M.G.'s identification testimony, and specifically declined to challenge that ruling. Accordingly, it appears that Petitioner's appellate counsel made a conscious decision to present only the strongest claim concerning M.G.'s identification testimony, rather than every conceivable claim concerning this aspect of the case.

4
5
6
7

Even if appellate counsel erred in failing to argue that trial court erred in denying Petitioner's motion to exclude M.G.'s identification testimony, such error was not prejudicial because the claim could not have prevailed on appeal. (*In re Reno* (2012) 55 Cal.4th 428, 465.) Before trial, Petitioner filed a motion to exclude M.G.'s past out-of-court and future in-court identification testimony "as being the product of unduly suggestive police procedures." The trial court denied the motion, noting that the identification procedure complained of would concern the weight of the evidence, rather than the admissibility. Additionally, the trial court noted that a "single person showup" is not illegal.

8
9
10
11
12

Attached as an exhibit to the Petition is what appears to be a transcript of the interview with M.G. in which police show M.G. a single photograph of Petitioner. Sergeant Scott Wong asks M.G., "Just as far as last time, um, none of them looked familiar to you as the person you just described as the shooter. Let me show you his photo and tell me if he looks like the person? Okay?" M.G. responds, "Mh-hm. Mm-hm." Sergeant Jason Anderson asks, "That's him?" M.G. responds, "Mm-hm." Sergeant Wong then states, "Do me a favor, Uh . . . ", and M.G. states, "Yep. That's him." Shortly thereafter, Sergeant Anderson asks, "So that's the one you saw shoot?" M.G. responds, "Mm-hm." Sergeant Anderson asks, "The boy?" M.G. responds, "Yep." M.G. further confirmed that she has known Petitioner for about four years and would see him on a daily basis.

13
14
15
16
17
18
19

An identification may be so unreliable that it violates a defendant's right to due process under the Fourteenth Amendment. (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 37.) "The defendant bears the burden of proving unfairness as a 'demonstrable reality,' not just speculation." (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819.) The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary, and if so (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation (*People v. Gordon* (1990) 50 Cal.3d 1223, 1242, overruled on other grounds in *People v. Edwards* (1991) 54 Cal.3d 787, 831.) "If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable." (*Ibid.*)

20
21
22
23
24
25
26
27

28

The single person showup is not inherently unfair. (*People v. Ochoa* (1998) 19 Cal.4th

United States District Court
Northern District of California

353, 413.)  While "[n]umerous cases have condemned the use of a single photo identification procedure", "numerous cases have found no due process violation from the admission of evidence of identifications made either at the time of or subsequent to a single photo showup." (*Contreras*, *supra*, 17 Cal.App.4th at 820-821, citing *Simmons v. United States* (1968) 390 U.S. 377, 384; *Stovall v. Denno* (1967) 388 U.S. 293, 302; *People v. Hernandez* (1988) 204 Cal.App.3d 639, 653; *People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009; *People v. Pervoe* (1984) 161 Cal.App.3d 342, 358-359; *People v. Edwards* (1981) 126 Cal.App.3d 447, 455; *Wilson v. Superior Court* (1977) 70 Cal.App.3d 751, 757; *People v. Allen* (1974) 41 Cal.App.3d 196, 204; *People v. Greene* (1973) 34 Cal.App.3d 622, 642-643.)  For a witness identification procedure to violate due process, "the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*Ochoa*, *supra*, 19 Cal.4th at 413.)  "Whether an identification procedure is suggestive depends upon the procedure used as well as the circumstances in which the identification takes place." (*Nguyen*, *supra*, 23 Cal.App.4th at 38.)

Here, it does not appear that M.G.'s identification of Petitioner as the shooter when shown a single photograph of Petitioner was unduly suggestive.  The photograph of Petitioner was shown to M.G. during her third interview with police, after she had provided details about how long she had known Petitioner and the last time she had seen him.  The questioning of M.G., as provided in the above-described transcript, does not seem to improperly suggest something to M.G., as police acknowledged that they had shown M.G. prior photographs, none of which she identified as the shooter, and that they were going to show her another.  The police did not inform M.G. that he was suspected as the shooter, nor did they encourage M.G. to identify Petitioner as the shooter.  "A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police." *People v. Slutts* (1968) 259 Cal.App.2d 886, 891.[]  Such suggestion does not appear to have occurred here.

Where, as here, it is found that a challenged procedure is not impermissibly suggestive, the inquiry into the due process claims ends.  (*Ochoa*, *supra*, 19 Cal.4th at 412.)  However, even assuming, arguendo, that the pretrial procedures were suggestive, such a finding would not end the analysis in Petitioner's favor.  (*Contreras*, *supra*, 17 Cal.App.4th at 820.)  Due process interests are affected only when there is a causal relationship between the photographic procedure and the witness's identification of the defendant.  (*Id.* at 821.)  "This is most commonly illustrated by cases in which the trial court is convinced that the witness's identification is based on an independent recollection of the assailant, and allows admission of the identification." (*Ibid.*)  Here, even if the procedure was impermissibly suggestive, it did not, under the totality of the circumstances, create a substantial risk of misidentification at trial.

M.G. had ample opportunity to view Petitioner at the time of the crime, and her attention was certainly focused on the events, as she was awakened by the sound of fighting and went to her window, which had a view of Mead.  She then saw two men fighting, continued to observe them arguing, and then saw Petitioner turn onto Mead and the ensuing shooting.  M.G. was presented with Petitioner's photograph six days after the murder.  Although M.G. was mistaken about Petitioner's nicknames and relationship, and told police that she did not think Petitioner had any tattoos, even though he did have tattoos on his back, forearm, and upper arm, on balance, her identification was reliable under the

totality of the circumstances.

While M.G.'s identification may not have been "the most reliable . . . the admission of such testimony does not violate due process in and of itself." (*Gordon*, *supra*, 50 Cal.3d at 1243.)  Here, "defense counsel did indeed cross-examine [on the witness's] identification and argued against its reliability, and did so vigorously. There was no denial of due process." (*Ibid*.)  There was no "unfairness, certainly none offending constitutional standards, in the court's decision to allow the identification evidence.  The jury was made fully aware of the circumstances leading to [the witness's] ultimate, in-court identification." (*Contreras*, *supra*, 17 Cal.App.4th at 823.)  Here, evidence was admitted that M.G. identified Petitioner from a single photograph but could not identify other participants in the fight in sequential lineups.  Nothing prevented the jury from considering these facts in determining what weight to give her identification.

As in *Contreras*, the jury was instructed under CALJIC No. 2.92 to consider a non-exclusive list of factors in determining the weight to be given eyewitness identification testimony and the accuracy of the witness's identification of the defendant, including "[w]hether the witness was able to identify the alleged perpetrator in a photographic or physical lineup," "[w]hether the witness'[s] identification is in fact the product of his [or her] own recollection[,]" and "[a]ny other evidence relating to the witnesses] ability to make an identification." (*Id*. at 824.)  Petitioner's trial counsel argued at length in closing that M.G.'s identification was unreliable, including because it was the product of suggestive procedure.  "The credibility of a witness's testimony is a question for the jury at trial, not an issue to be resolved in pretrial motions."  (*Ibid*.)

Here, Petitioner's trial counsel highlighted that M.G. identified Petitioner after the police showed her only one photograph, "the single most prejudicial way to get an identification." Counsel argued that although the police attempted to justify this procedure on the basis that M.G. knew Petitioner, the information M.G. provided about Petitioner was mistaken in several aspects, including as to which names he was known by and whether he had tattoos. Therefore, Petitioner was provided ample opportunity to attack the identification, and trial counsel did in fact vigorously seize upon such opportunity.

"'It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias.  While identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the "integrity"—of the adversary process.

"'Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.'"

(*Manson v. Brathwaite* (1977) 432 U.S. 98, 113-114, fn. 14, quoting, without footnote, *Clemons v. United States* (D.C. Cir. 1968) 408 F.2d 1230, 1251 (conc. opn. of Leventhal, J.).)

In short, admission of M.G.'s identification did not violate due process.  Therefore, even if

37

United States District Court
Northern District of California

appellate counsel had advanced this argument on appeal, it would not have prevailed, and
Petitioner did not suffer prejudice thereby.

Dkt. No. 22-12 at 404-09; Resp't Ex. 12.

Petitioner contends that appellate counsel was ineffective for failing to challenge the admission of M.G.'s out-of-court photo identification and in-court identification of Petitioner as the shooter. Dkt. No. 1 at 17-20. The state superior court's decision was reasonable under both prongs of the *Strickland* test. First, the state superior court found that appellate counsel made the tactical decision to challenge the lack of a pinpoint instruction on the identification evidence rather than the admission of the evidence itself, and that this decision was not deficient performance. As noted above, appellate counsel's decision to present only the strongest arguments on appeal is entitled to great deference by the Court, and will rarely show ineffectiveness. *Miller*, 882 F.2d at 1434 ("[A] lawyer who throws in every arguable point—'just in case'—is likely to serve her client less effectively than one who concentrates solely on the strong arguments.").

Petitioner fails to show that appellate counsel unreasonably failed to brief a merit-worthy issue. *Smith*, 528 U.S. at 285. The state superior court reasonably concluded that the single photograph of petitioner police presented to M.G. was not unduly suggestive under the totality of the circumstances. Dkt. No. 22-12 at 406-07; Resp't Ex. 12. As the state superior court pointed out, Petitioner's photograph was shown to M.G. after "she had already provided details about how long she had known Petitioner and the last time she had seen him." *Id.* at 406. M.G. "confirmed that she ha[d] known Petitioner for about four years and would see him on a daily basis." *Id.* at 405. Additionally, the state superior court found that the transcript showed that the questioning of M.G. did not seem to "improperly suggest something to M.G.," as the police acknowledged that they had previously showed her photos of other people, none of which she identified as the shooter, and that they were going to show her another photograph. *Id.* Upon reviewing the evidence, the state superior court concluded that the police "did not inform M.G. that he was the suspected shooter, nor did they encourage M.G. to identify Petitioner as the shooter." *Id.* at 406-407. The state superior court further noted that "evidence was admitted that M.G. identified Petitioner from a single photograph but could not identify other participants in the fight in

sequential lineups," and that "[n]othing prevented the jury from considering these facts in determining what weight to give her identification." *Id.* at 408.  Overall, the state superior court found that "Petitioner was provided ample opportunity to attack the identification and trial counsel did in fact vigorously seize upon such opportunity." *Id.*  On this record, the Court finds objectively reasonable the state superior court's conclusion that the identification procedure was not impermissibly suggestive.

In addition, it cannot be said that Petitioner would have prevailed in his appeal had appellate counsel raised this claim. *Smith*, 528 U.S. at 285-86.  The state superior court reasonably concluded that, even if the procedure was impermissibly suggestive, the exclusion of M.G.'s identification testimony was not warranted because "it did not, under the totality of the circumstances, create a substantial risk of misidentification at trial." Dkt. No. 22-12 at 407; Resp't Ex. 12.  The state superior court found that the record showed that M.G. had ample opportunity to view Petitioner at the time of the crime, had an unobstructed view of the shooting from her window, and was presented with Petitioner's photo promptly—six days after the murder. *Id.* Moreover, the record shows that M.G. did not waver in her identification of Petitioner at trial, even though she feared for her safety.  *See* 1 RT 121, 156, 207, 162-165, 188-191, 220-222. Given this record, the state superior court's conclusion that the identification was otherwise reliable was not objectively unreasonable.

Accordingly, Petitioner is not entitled to federal habeas relief as to this claim.

### c.    Ineffectiveness for Failing to Raise Claim 3

The state superior court denied Petitioner's ineffective assistance claim for appellate counsel's failure to raise claim 3 (the prosecution failed to preserve or turn over exculpatory evidence) as follows:

> *Appellate Counsel Was Not Ineffective For Failing To Challenge Issues Concerning PDRD Evidence.*
>
> Petitioner alleges that material and exculpatory evidence in the form of PDRD [portable digital recording device] recordings were destroyed, and that appellate counsel was ineffective for failing to raise this issue on appeal.  Attached as an exhibit to the Petition is a motion filed by Petitioner's trial counsel on November 12, 2015 to dismiss or for other appropriate relief for failure to preserve exculpatory evidence.  In this motion, Petitioner's

trial counsel alleges that the police had destroyed all of the PDRD's related to this case.  In [] particular, counsel protested that the PDRD of M.G.'s initial statement to the arresting officer shortly after the incident is missing, and the PDRD of W.L.'s statement to police after his arrest concerning his knowledge of the homicide was turned into the Oakland Police Department (OPD) and uploaded to the storage system, but was subsequently destroyed.  Attached as an exhibit to this motion is a memorandum from the prosecution stating, "PDRDs.  I previously told you that we requested them all.  We have been advised (by OPD) that a search for all the PDRDs was made and none of the videos exist.  The OPD tech told us that all videos older than 2014 have been removed from their system.  The tech went on to ask the vendor to see if he could recover the videos.  The vendor searched and could not find them."

Also attached as an exhibit to the Petition is a transcript of the argument and ruling on this motion.[FN 4]  Petitioner's trial counsel argues that there are no PDRDs at all in this case, and is particularly concerned with the PDRDs for M.G. and W.L., and requests dismissal or a jury instruction.  When asked by the court if the PDRDs contained exculpatory information, counsel responded, "I believe that any—any of the—well, my concern is that there was something said by the percipient witness that was not recorded in their written statements because not everyone came in and gave a videotaped statement to police."  Counsel also argues that one witness who said he saw the whole incident suffered from Alzheimer's disease, and it is unclear if he provided any information that might have been helpful to the defense.  In response, the prosecution states that there is no PDRD for M.G.'s initial statement to police, so it could not have been destroyed as the recording device did not work.  With respect to W.L., the prosecution states that it appears that a PDRD existed and was in working order when he was arrested, and then W.L. was handed over to another OPD officer for transport to jail, during which W.L. offered information about the homicide.  This latter officer did not have a PDRD on him for that transport.  Therefore, the prosecution argues, all that is left is a potential discussion between W.L. and the arresting officers that was captured on the destroyed PDRD recording.

[FN 4:] It does not appear that Petitioner attached a copy of the prosecution's response to this motion which, according to this transcript, was filed on December 4, 2015.

The trial court denied the motion to dismiss, and found that this did not warrant a special instruction from the court.  The court stated, "I don't see any evidence that there was any bad faith in the destruction or any specific finding of exculpatory evidence be included in anything that might have been recorded on the PDRD.  Certainly, [defense counsel], during cross-examination you can talk about, did you have a PDRD?  Did it record?  Do you have the recording?  What happened to it?  That's fair game for credibility . . .  But I don't believe there's any need or requirement for a special instruction by the Court or dismissal."

Unless bad faith is shown, the failure of the prosecution to preserve "evidentiary material" which "might have exonerated the defendant" does not violate due process.  (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58.)  Here, the trial court found that there was no evidence of bad faith in the destruction of the PDRDs, and Petitioner proffers no evidence in his Petition to disturb such a finding.

However, even in the absence of bad faith, the failure of the prosecution to preserve

evidence that "might be expected to play a significant role in the suspect's defense" does violate due process.  (*California v. Trombetta* (1984) 467 U.S. 479, 488-489.)  In such cases, the evidence must possess both "an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  (*Ibid.*)  Here, neither of these conditions are met.  Although the preservation of the PDRD of W.L.'s arrest might conceivably have contributed to Petitioner's defense, as argued by his trial counsel, there is no indication that such evidence would have been exculpatory, as found by the trial court. Additionally, Petitioner was not without alternative means of demonstrating his innocence, as W.L. and the officers could have testified concerning W.L.'s statements during his arrest, and information concerning this arrest was documented in police reports. Furthermore, as demonstrated by the exhibits attached to the Petition, there appears to be significant testimony concerning W.L.'s subsequent identification of Petitioner.  Therefore, the destruction of the PDRD relating to W.L.'s arrest does not offend due process.

As to the failure to record M.G.'s initial statement to police and other alleged PDRD recordings that were not taken, "Generally, due process does not require the police to collect particular items of evidence."  (*People v. Montes* (2014) 58 Cal.4th 809, 837.) "Although this court has suggested that there might be cases in which the failure to collect or obtain evidence would justify sanctions against the prosecution at trial, we have continued to recognize that, as a general matter, due process does not require the police to collect particular items of evidence."  (*People v. Frye* (1998) 18 Cal.4th 894, 943, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Even if *Trombetta* and its progeny apply to a claim of failure to collect evidence, Petitioner's claim would fail as "*Trombetta* speaks of evidence whose exculpatory value is 'apparent.'" (*Arizona v. Youngblood*, *supra*, 488 U.S. at p. 56, fn. *; *People v. Montes* (2014) 58 Cal.4th 809, 838.)

Accordingly, the failure to Petitioner's appellate counsel to raise this claim on appeal was not deficient performance, and even if it was, Petitioner suffered no prejudice, as the claim was without merit.

Dkt. No. 22-12 at 409-12; Resp't Ex. 12 (footnote in original).

Petitioner contends that appellate counsel was ineffective for failing to challenge the prosecution's alleged failure to preserve body camera evidence.  Dkt. No. 1 at 17-18, 21-22.  The state superior court reasonably concluded that Petitioner failed to satisfy either prong of the *Strickland* test.

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means.  *See California v. Trombetta*, 467 U.S. 479, 489 (1984).

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must

41

be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality, [] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 488-89 (citation omitted).

Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only potentially useful, in that there can be no due process violation absent bad faith conduct by the police in failing to preserve potentially useful evidence.  *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57.

The state superior court determined that the evidence was not exculpatory and that there was no evidence of bad faith in the destruction of the PDRDs.  Dkt. No. 22-12 at 409-12; Resp't Ex. 12.  Such findings are entitled to a presumption of correctness under § 2254.  *See Dyer v. Calderon*, 151 F.3d 970, 975 (9th Cir. 1998) ("So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.").  To rebut this presumption, a petitioner must present clear and convincing evidence establishing that the state courts' findings were erroneous. *See* 28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) ("Once the state court's fact-finding process survives this intrinsic review [,] . . . the state court's findings are dressed in a presumption of correctness [ ]" and may be overturned only if new evidence presented for the first time in federal court "amounts to clear and convincing proof that the state-court finding is in error.").  Here, Petitioner has failed to demonstrate any flaw in the state courts' fact-finding process, or present any evidence, let alone clear and convincing evidence, to support his claim.

As an initial matter, the state superior court's foundational finding—that the only footage recorded by body camera was the interaction between W.L. and arresting officers—is entitled to a presumption of correctness.  Dkt. No. 22-12 at 410; Resp't Ex. 12.  As the state superior court

United States District Court
Northern District of California

pointed out, there was nothing in the record indicating that W.L. offered information about the shooting to arresting officers, which further suggested that there was not any exculpatory evidence relating to Petitioner on any lost body camera footage. *Id.* Further, the state superior court noted that the trial court "d[id]n't see any evidence that there was any bad faith in the destruction or any specific finding of exculpatory evidence be included in anything that might have been recorded om the PDRD." *Id.* at 401-11. On the contrary, the state superior court pointed out that the evidence showed that the recording was deleted simply as the result of a departmental policy calling for the expungement of all older recordings from the storage system. *Id.* at 409-10. Finally, as the state superior court found, Petitioner was free to question W.L. and the arresting officers about their interaction and the destruction of the body camera footage. *Id.* at 411.

Therefore, the state superior court reasonably concluded that there was no merit to Petitioner's prosecutorial misconduct claim, and that appellate counsel was not ineffective for failing to raise the claim on appeal. Accordingly, Petitioner is not entitled to federal habeas relief as to this claim.

### d.    Ineffectiveness for Failing to Raise Claim 4

The state superior court denied Petitioner's ineffective assistance claim for appellate counsel's failure to raise claim 4 (the trial court erred in allowing the video reenactment) as follows:

> *Appellate Counsel Was Not Ineffective For Failing To Challenge The Admission of the Video Reenactment.*

Petitioner also contends that appellate counsel was ineffective for failing to challenge on appeal the admission of a video reenactment that was presented at trial. As can be discerned from the Petition and the attached exhibits, the prosecution presented a video prepared by Thomas Milner, a police inspector for the Alameda County District Attorney's Office, wherein he was videotaped timing himself walking a certain route at the crime scene. Petitioner's trial counsel objected on relevance grounds, to which the prosecution argued the video showed the ground that Petitioner could have covered in the time that he was not depicted in a surveillance tape. The trial court noted that there was some question about Petitioner being able to accomplish that task. Petitioner's trial counsel further argued that the video was speculative, but the trial court ultimately found, "It's a reasonable inference that the route that the inspector walked is the route that the shooter took, and I think the time frame sets at least an outside time frame because [probably], whoever the shooter was, was moving faster than the inspector was. So if he, walking that

43

way, took a minute and 11 seconds, then you can infer that that would have been the most it would have taken and probably less than that.  So I think it has some probative value.  I don't see any prejudice to the Defense by playing it."

In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1114, citing *DiRosario v. Havens* (1987) 196 Cal.App.3d 1224, 1232-1233.)  Within these limits, the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time the videotape is taken.  (*Ibid*.)  In *Rodrigues*, the California Supreme Court found that the trial court properly admitted a video offered as demonstrative evidence to show the jurors the relative locations of the victims' apartment, a witness's apartment, and other aspects of the apartment building to show the witness's vantage point as she observed assailants flee the scene.  (*Rodrigues*, *supra*, 8 Cal.4th 1060 at 1114.)  The court also held that the trial court could properly find that a viewing of the videotape would aid the jurors in their determination of the facts of the case notwithstanding the claimed inaccuracies.  (*Id*. at 1114-1115.)  The court further found that the same was true for the videotaped scenes which were intended to show the length of time that the assailants turned to look in the witness's direction and the direction in which they ran, as the witness's testimony verified the accuracy of the videotaped depictions in this regard.  (*Id*. at 1115, fn. 19.)

Here, the trial court properly admitted the video.  There is no indication that the video did not reasonably represent what it was alleged to portray, i.e. a possible route that the shooter took and the time it took to cover that ground.  The trial court also properly found that the video would assist the jurors in their determination of the facts of the case, as the court noted, there was some question about Petitioner being able to accomplish that task.  There is no indication that this video would serve to mislead the jury, and appears to be probative evidence to assist the jury in the determination of an ancillary issue that the defense apparently contested, as the prosecution argued, "There were questions that they recognized that [defense counsel] asked last week about that being capable, that he couldn't get to the corner and doing what he could do, and I wanted to put into evidence to affirmatively show so the jury didn't have to speculate on the grounds that someone could walk at the pace that Inspector Milner did this morning, and what ground could be covered."

Petitioner relies upon *People v. Boyd* (1990) 222 Cal.App.3d 541 and *People v. Jones* (2011) 51 Cal.4th 346, cases in which video reenactments which purported to replicate lighting conditions were excluded.  However, the purpose of the evidence in those cases was to demonstrate the lighting conditions under which witnesses were able to view of the events of the crime, therefore "those conditions assumed great significance in assessing the admissibility of the evidence."  (*Rodrigues*, *supra*, 8 Cal.4th 1060 at 1115.)  However, here, as in *Rodrigues*, the videotape was not offered for the purpose of showing lighting conditions, and Petitioner fails to demonstrate any inaccuracies could have made the video misleading as to the purposes for which it was offered.  (*Ibid*.)

Accordingly, admission of the video did not constitute error, therefore Petitioner's

appellate counsel was not deficient in failing to raise the claim on appeal, and even if he was, Petitioner was not prejudiced by such alleged deficient performance.

Dkt. No. 22-12 at 412-14; Resp't Ex. 12.

Petitioner contends that appellate counsel was ineffective for failing to challenge the admission of video reenactment evidence under California law. Dkt. No. 1 at 17-18, 23-24. The state superior court reasonably concluded that appellate counsel was not ineffective for failing to challenge the admission of the video reenactment evidence on appeal because the admission of the video did not constitute error under state law. Dkt. No. 22-12 at 414-15; Resp't Ex. 12. The state superior court's determination that the evidence was admissible under *state law* may not be reexamined by this Court. *Estelle*, 502 U.S. at 67-68; *Mendez*, 298 F.3d at 1158. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### e.      Ineffectiveness for Failing to Raise Claim 5

The state superior court denied Petitioner's ineffective assistance claim for appellate counsel's failure to raise claim 5 (the prosecutor committed misconduct by allowing false testimony at trial) as follows:

> *Appellate Counsel Was Not Ineffective For Failing To Argue On Appeal That The Prosecution Used False Testimony At Trial.*
>
> Petitioner also contends that appellate counsel was ineffective for failing to argue on appeal that the prosecution used the false testimony of M.G. and W.L. at trial. Petitioner's contention appears to be based upon alleged inaccuracies, contradictions, and inconsistencies of these witnesses' testimony. Accordingly, Petitioner claims that the testimony "was so incredible that the prosecution presented false testimony in using him as a witness. We disagree. The prosecution simply presented its evidence and allowed a fully informed jury to evaluate it." (*People v. Riel* (2000) 22 Cal.4th 1153, 1181.) Inconsistency between a witness's pretrial statements, including preliminary hearing testimony, and trial testimony "does not ineluctably demonstrate his trial testimony was false, or that the prosecutor knew it was false." (*People v. Avila* (2009) 46 Cal.4th 680,712.) In any case, when a witness whose testimony is alleged to be false is subjected to cross-examination and impeachment, the defendant is not denied, a fair trial or due process. (*Riel*, *supra*, 22 Cal.4th at 1180-1182.) Here, Petitioner's claims of false testimony do not appear to be based on facts that existed independently of the contradictions appearing at trial, and Petitioner was not precluded from presenting the alleged true matter at trial.
>
> Therefore, Petitioner's appellate counsel was not ineffective for failing to raise this claim on appeal, and any defective performance was not prejudicial.

United States District Court
Northern District of California

Dkt. No. 22-12 at 414-15; Resp't Ex. 12.

Petitioner contends that appellate counsel was ineffective for failing to argue on appeal that the prosecutor used false testimony at trial. Dkt. No. 1 at 17-18, 24-25. The state superior court reasonably concluded that Petitioner's appellate counsel was not ineffective for failing to argue on appeal that the prosecution used false testimony at trial. Dkt. No. 22-12 at 414-415; Resp't Ex. 12. And even if the decision of appellate counsel not to raise this claim on direct appeal had been objectively unreasonable, Petitioner cannot meet the second prong of the *Strickland* test because the state superior court reasonably determined that any defective performance was not prejudicial. *Id.*

Moreover, the state appellate court reasonably concluded that there was no merit to Petitioner's underlying claim of prosecutorial misconduct for knowingly presenting false testimony (claim 5). *See* Dkt. No. 22-12 at 803; Resp't Ex. 14. As discussed above, this Court has already found that Petitioner was not entitled to federal habeas relief on claim 5 because the state appellate court reasonably concluded that Petitioner did not sustain his burden of establishing the elements of his claim, i.e., that M.G. and W.L. gave false testimony, or that the prosecutor knew it was false. *See supra* DISCUSSION Part IV.C.3. In light of this conclusion, the state courts reasonably rejected Petitioner's ineffectiveness claim. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### f.      Ineffectiveness for Failing to Raise Claim 7

The state superior court stated as follows as to the remaining grounds, including Petitioner's ineffective assistance claim for appellate counsel's failure to raise claim 7 (the *Griffin* error relating to Petitioner's jail conversations with his mother and girlfriend):

> *Appellate Counsel Was Not Ineffective For Failing To Argue Remaining Claims On Appeal.*
>
> As to Petitioner's claim that appellate counsel was ineffective for failing to argue on appeal that the trial court erred by denying Petitioner's request for a pinpoint jury instruction about suggestive identification procedures, the prosecution committed misconduct by commenting on Petitioner's silence during the prosecution's rebuttal to the defense's closing argument, and the prosecutor's rebuttal to the defense's closing argument was improper under *Griffin v. California* (1965) 380 U.S. 609, these issues were raised [and] rejected on appeal. Accordingly, Petitioner's appellate counsel performance was not

deficient in this regard.

Therefore, for all of the above reasons, Petitioner's claim that he was denied the effective assistance of appellate counsel fails to state a prima facie case for relief.

Dkt. No. 22-12 at 415-16; Resp't Ex. 12.  As previously stated, there is no reasoned state court decision addressing this ineffectiveness claim as to appellate counsel's failure to raise claim 7. Thus, the Court will conduct "an independent review of the record" to determine whether the California Supreme Court's summary denial of this claim was contrary to or an unreasonable application of clearly established federal law.  *Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853.

Petitioner contends that appellate counsel was ineffective for failing to raise a second *Griffin* claim on appeal, based on the prosecutor's use of Petitioner's jail conversations as evidence of his consciousness of guilt.  Dkt. No. 1 at 17-18, 28-29.  As set forth in the discussion above on the merits of the underlying claim of prosecutorial misconduct (claim 7), because the state courts rejected Petitioner's second *Griffin* claim, the state supreme court could have reasonably concluded that appellate counsel was not ineffective for failing to raise this claim on appeal.  *See supra* DISCUSSION Part IV.C.2.c.  Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### g.     Summary

In sum, habeas relief is not warranted on Petitioner's claim that appellate counsel was ineffective for failing to raise his state habeas claims on direct appeal.  The state supreme court's summary rejection of Petitioner's ineffective assistance of counsel claim was not an objectively unreasonable application of the *Strickland* standard.  Accordingly, Petitioner is not entitled to relief on claim 1.

## V.     CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## VI.    CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated:  8/30/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California